IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

**JUL 08 2021**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 1:20-CR-83 |
| v. | § | **BY** **DEPUTY**_____ |
| | § | Judge Heartfield |
| WILLIAM GLENN CHUNN, | § | |
| a/k/a "BIG HEAD"; (1) | § | |
| KEVIN SCOTT KENT, | § | |
| a/k/a "BIG KEV"; (3) | § | |
| JESSE PAUL BLANKENSHIP; | § | |
| a/k/a "JP"; (5) | § | |
| TIMOTHY LONG, | § | |
| a/k/a "TIMMY" (6) | § | |

## FIRST SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

## COUNT ONE
*Conspiracy to Participate in a Racketeering Enterprise*

### Introduction

### The Racketeering Enterprise: The Aryan Circle

1.     At all times relevant to this Indictment, the defendants WILLIAM GLENN

CHUNN, a/k/a "BIG HEAD," Michael Martin, a/k/a "Aryan Prodigy," a/k/a "AP," KEVIN

SCOTT KENT, a/k/a "BIG KEV," Malachi David Wren, JESSE PAUL BLANKENSHIP,

a/k/a "JP," TIMOTHY LONG, a/k/a "TIMMY," Jeremy Chad Dennis, a/k/a "JD," Becky

Westbrook, and others, known and unknown to the Grand Jury, were members and

associates of the Aryan Circle (hereinafter the "AC"), a criminal organization whose

members and associates engaged in controlled substances distribution, firearms trafficking, and acts of violence, including acts involving murder, assault, robbery, witness intimidation, and kidnapping. At all times relevant to this Indictment, the AC operated throughout the Eastern District of Texas, the states of Alabama, Arkansas, Indiana, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, Virginia, and elsewhere.

### Structure and Operation of the Enterprise

2.     The structure and operation of the AC included, but was not limited to, the following:

a.     The AC was a violent, race-based, "whites only" prison-based gang with hundreds of members operating inside and outside of state and federal penal institutions throughout Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, Virginia, and elsewhere. The AC offered protection to white inmates if they joined the gang.

b.     The AC was established in approximately 1985 within the Texas Department of Criminal Justice (TDCJ), where the traditional power centers of the AC and members of the gang's leadership structure resided. More recently, the AC's structure and influence expanded to rural and suburban areas throughout Texas, Louisiana, Arkansas, Missouri, and Indiana, among other states. The AC emerged during a period of internal turmoil within the Aryan Brotherhood of Texas (ABT). Its original membership contained several ex-ABT members as well as others rejected for ABT membership. The AC was relatively small in comparison to other prison-based gangs, but grew in stature and

Indictment – Page 2

influence within TDCJ in the 1990s, largely through violent conflicts with other gangs, white and non-white alike, including the Mexican Mafia, the ABT, and others.

  c.  The AC had a detailed and uniform organizational structure, which is outlined - along with various rules, procedures, and code of conduct - in a written "constitution" widely distributed to members throughout Texas, Louisiana, and elsewhere.

  d.  The AC had a defined militaristic structure. AC members referred to the gang as the "Family." The AC had a complex organizational structure, which continued to evolve over time. The AC was overseen and directed by a five-member "Upper Board." The Upper Board had ultimate authority in all gang matters. Subordinate ranking members served to support the Upper Board to enforce gang members' discipline and adherence to established AC rules and laws. The Upper Board was comprised of the president, vice president, administrative chairman, and two other members. The AC had several branches: one for Texas prisons; one for the federal prison system; one for out of state prisons; one for out of state "free world" (non-incarcerated gang members); and one for the Texas "free world,", each of which had its own Middle Board. The AC also had a subgroup known as a motorcycle biker branch. The out of state prisons were further divided into a handful of regions, each incorporating one or more states. The Middle Boards each included the Upper Board members, as well as the vice president and director of each branch. Rules and regulations for the various branches came from Center Rings, which included all Middle Board Members.

  e.  The AC was also divided between prison and free world chains of command. Each prison had its own hierarchy. In the free world, Texas was divided into

districts, presided over by district captains, who reported to majors who controlled a number of districts. The AC's ranking structure remained constant; however, personnel changes (promotions, demotions, and terminations) occurred frequently.

f.      The AC also had certain members assigned to the "Task Force," which was comprised of a small group of members handpicked by the Upper Board to enforce the rules of the organization and perform specific tasks or responsibilities. The Task Force was led by a commander and such tasks could range from managing some aspect of the AC's organization to performing a "hit" (kill order) or other specific criminal act of violence, including meting-out punishment against fellow gang members who violated the gang's rules or killing rival gang members.

g.      AC Upper Board leaders had the authority within the gang to issue "D.O.'s" (direct orders) and mete out punishment. A D.O. was an assignment given to a subordinate AC member that would serve a purpose for the AC. The D.O. from a leader ordering a "violation" could be classified as "minor, serious, or major." The order could be an "S.O.S." (smash on sight), meaning the assault of an AC member who had committed a violation of the AC rules, which usually resulted in the removal of that member's AC "patch" (gang tattoo) and membership. The D.O. could also be a "Green Light," meaning an attack up to and including the murder of a rival gang member or of an AC member or associate who had committed an egregious violation of the gang's rules. Failure to perform a D.O. resulted in the assigned member being in violation of the rules. Punishment for failing to complete the D.O. could range anywhere from a fine, written violation, beating, or death.

h.  Members of the AC greeted each other and showed their membership in the gang using a handshake intended to represent the motto: "Silence is Golden; Silence is Deadly; Silence is Mandatory; My Honor is called Loyalty!" The AC employed a robust symbology as well, using depictions of Nazi-style inspired symbols and artwork to demonstrate their affiliation. Members often had tattoos incorporating one or more Nazi-style symbols including, but not limited to, the Iron Cross, eternal flame, "13" (for first and third letters of the alphabet – "AC"), swastika, and Schutzstaffel ("SS") lightning bolts, as well as State-specific symbols. The most coveted tattoo of AC membership was the AC patch, which could be worn only by fully made members who generally ascended to full membership by committing a "blood-in mission" (aggravated assault or murder) on behalf of the gang. The design and shape of the patch evolved over time. The diamond tattoo was the basic AC tattoo or "patch." It had many variations, including variations for different states, though common to each tattoo was a swastika tilted to resemble a diamond, "SS" bolts, and the letters "AC" in the center. An older version of the AC patch was a circle with "SS" bolts inside it. AC lexicon included "113%" (100% Aryan Circle), "1388" or Aryan Circle variation of white supremacist code "14/88" (the 88 stood for Heil Hitler), "CFFC" (Circle Forever, Forever Circle), and "DFFD" (Diamond Forever, Forever Diamond), among others. The colors associated with the AC were blue and gray, and members of the AC often demonstrated their affiliation with the AC by wearing clothing containing the colors blue and gray or incorporating some of the gang's other symbols or phrases.

i.    Once released from incarceration, AC members were required to remain loyal to the AC and to immediately report to outside leaders to further the goals of the AC through criminal activity. They were required to attend "church," or meetings, which were held to discuss and conduct AC gang business. One of the goals of the AC was to recruit new members. AC members were recruited from both inside and outside state and federal penal institutions. In order to be considered for AC membership, a person had to be sponsored by another AC member. Once sponsored, a prospective member had to serve a "pre-prospect" term usually of not less than six months, during which he was referred to as a prospect, and his conduct was observed by other gang members. During this period, the prospect was required to study and learn the AC constitution and by-laws. During the prospect period, the individual was considered part of the AC family and entitled to the full protection of the gang. The prospect was also subject to the rules and orders of the gang. If the prospect's conduct during the probationary period was deemed satisfactory, his membership to the gang was submitted to the gang members. The vote had to be unanimous for the prospect to be admitted to the AC. The prospect could be "black-balled" by a single member of the gang, and refused admission to the AC. All AC members were required to attend monthly "church" meetings where criminal activity was discussed, financial proceeds from criminal activity were collected including, but not limited to, collection of drug proceeds from subordinate gang members for senior AC gang leaders, and disciplinary beatings of fellow AC gang members were administered. All incarcerated AC members were expected to "put in work" for the "family" in order to earn the right to wear the AC patch. This normally required committing an act of violence on

behalf of the organization. This rule for AC members in the free-world was more loosely applied. Membership in the AC was for life. There was generally no retirement from the AC.

j.    Unlike most major prison-based gangs, the AC admitted women as full members and had a significant female membership that belonged to the women's branch of the AC. Some women had achieved positions of considerable importance and responsibility within the organization. In addition to members, the enterprise included those closely affiliated with the AC, who were called "associates." Wives or girlfriends of AC members who were not themselves full patched members were often associates. They were allowed to associate with the AC so long as they complied with the gang's rules and served to promote the goals of the "family." Female associates functioned as communications hubs, facilitating gang communications and criminal activities among imprisoned members throughout the penal system by using the telephone, the internet, the United States Mail, and common carriers. They also smuggled drugs, cellular telephones, and other items of contraband to imprisoned gang members.

### The Racketeering Enterprise

3.    The AC, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Sections 1961(4) and 1959(b)(2) (hereafter "the enterprise"), that is a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## Purposes of the Enterprise

4.    The purposes of the enterprise included, but were not limited to, the following:

a.    Enriching the leaders, members, and associates of the enterprise through, among other things, illegal trafficking of controlled substances and firearms;

b.    Preserving, protecting, and enhancing the power, territory, reputation, and profits of the enterprise through the use of threats, intimidation, and violence, including, but not limited to, acts involving murder, assault, obstruction of justice, and other acts of violence;

c.    Promoting and enhancing the enterprise and the activities of its leaders, members, and associates;

d.    Keeping victims in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and actual violence;

e.    Providing financial support to enterprise members who were charged with or incarcerated for gang-related activities.

## Means and Methods of the Enterprise

5.    The means and methods by which the leaders, members, and associates conducted and participated in the conduct of the affairs of the enterprise included the following:

a.    The leaders of the enterprise directed, sanctioned, approved, and permitted other members and associates to carry out acts in furtherance of the enterprise;

b.    Members and associates of the enterprise committed, conspired to commit, and threatened to commit acts of violence, including acts involving murder, kidnapping, robbery, assault, and witness intimidation to protect the enterprise's power, territory, and property;

c.    To generate income and build reputation, enterprise members and associates engaged in illegal activities under the protection of the enterprise, including, but not limited to, controlled substances trafficking and weapons trafficking;

d.    For protection, attacks, and armed combat, enterprise members and associates in the free world acquired, carried, and used firearms, and enterprise members and associates in prisons acquired, carried, and used sharp, knife-like objects, or shanks;

e.    Members and associates of the enterprise employed and used gang-related terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang;

f.    To perpetuate the enterprise and to maintain and extend their power, members and associates of the enterprise committed and conspired to commit acts involving murder, witness intimidation, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, rival organizations, AC members, and witnesses to illegal activities of the enterprise;

g.    Members and associates of the enterprise spoke in code when communicating over the telephone and/or in writing to avoid law enforcement detection, and communication in person was always preferable;

h.    Members and associates of the enterprise were forbidden from cooperating with law enforcement, and members of the enterprise reviewed legal paperwork for signs of cooperation.

### The Racketeering Conspiracy

6.    Beginning in or about 2010 and continuing through on or about the date of this Indictment, in the Eastern District of Texas, and elsewhere, the defendants:

WILLIAM GLENN CHUNN, a/k/a "BIG HEAD";
KEVIN SCOTT KENT a/k/a "BIG KEV";
JESSE PAUL BLANKENSHIP, a/k/a "JP"; and
TIMOTHY LONG, a/k/a "TIMMY,"

being persons employed by and associated with the AC, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, together with others known and unknown to the Grand Jury, did knowingly and intentionally conspire to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), consisting of multiple:

a.    Acts involving murder, in violation of Alabama Criminal Code, Sections 13A-6-2, 13A-4-1, 13A-4-2, and 13A-4-3; Arkansas Code, Sections 5-10-101, 5-10-102, 5-10-103, 5-3-201, 5-3-202, 5-3-401, 5-2-402, and 5-2-403; Kentucky Revised Statues, Sections 507.020, 506.010, 506.040, and 502.020; Louisiana Revised Statutes, Sections 14:30.1, 14.25; 14:26, and 14:27; Mississippi Code, Sections 97-3-19 97-1-7, 97-1-1, and 97-1-3; Missouri Revised Statutes, Sections 565.020, 565.021, 562.012, 562.014, and 562.041; New Jersey Revised Statutes, Sections 2C:11-3, 2C:5-1, and 2C:5-2;

Pennsylvania Law, Title 18 Sections 2502, 901, 902, and 903; Texas Penal Code, Sections 19.02, 7.01, 7.02, 12.32, 12.33, 15.01, 15.02, 15.03; and Virginia Criminal Code, Sections 18.2-32, 18.2-18, 18.2-22, and 18.2-26;

        b.      Acts involving kidnapping, in violation of Missouri Revised Statutes, Sections 565.110, 565.120, 562.012, 562.014, and 562.041;

        c.      Offenses involving trafficking in controlled substances, in violation of Sections 841(a)(1), 846, and 843 of Title 21, United States Code;

        d.      Acts indictable under Title 18, United States Code, Section 1503 (relating to obstruction of justice);

        e.      Acts indictable under Title 18, United States Code, Section 1512 (relating to tampering with a witness, victim, or an informant); and

        f.      Acts indictable under Title 18, United States Code, Section 1513 (relating to retaliating against a witness, victim, or an informant).

It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## OVERT ACTS

7.      In furtherance of the conspiracy and to achieve the objectives thereof, the defendants, and others known and unknown to the grand jury, performed and caused to be performed the following overt acts, among others, in the Eastern District of Texas, and the states of Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, Virginia, and elsewhere:

OA-1. On or about June 8, 2010, at a federal prison in Talladega, Alabama, an AC member known to the grand jury repeatedly stabbed members of a rival gang as ordered by WILLIAM GLENN CHUNN, a/k/a "BIG HEAD."

OA-2. In or about early January of 2012, KEVIN SCOTT KENT, a/k/a "BIG KEV," and other AC leaders known to the grand jury agreed to murder AC member Jamie Czeck, who wanted to leave the AC to join a different gang.

OA-3. On or about January 3, 2012, in Fort Smith, Arkansas, AC members known to the grand jury murdered Jamie Czeck by shooting him pursuant to the agreement among AC leaders known to the grand jury, including KEVIN SCOTT KENT, a/k/a "BIG KEV."

OA-4. On or about November 9, 2013, in a park in Jefferson County, Missouri, AC members known to the grand jury violently attacked, restrained, and burned an AC member's patch off with a flaming log to remove him from the gang upon the order of KEVIN SCOTT KENT, a/k/a "BIG KEV."

OA-5. On or about July 8, 2014, at a federal prison in Pollock, Louisiana, AC members known to the grand jury confined in a cell and stabbed another AC member approximately forty times as ordered by WILLIAM GLENN CHUNN, a/k/a "BIG HEAD," because the AC member sold a T.V. remote to Mexican gang members for drugs.

OA-6. On or about November 22, 2014, at a federal prison in Inez, Kentucky, AC members known to the grand jury stabbed a rival gang member as ordered by WILLIAM GLENN CHUNN, a/k/a "BIG HEAD."

OA-7. On or about May 7, 2015, at a federal prison in Lewisburg, Pennsylvania, WILLIAM GLENN CHUNN, a/k/a "BIG HEAD" physically attacked and beat another inmate because he believed that inmate was cooperating with law enforcement.

OA-8. On or about December 21, 2015, at a federal prison in Three Rivers, Texas, Jeremy Chad Dennis, a/k/a "JD" possessed and attempted to smuggle the drug suboxone inside the prison with the intent to sell the controlled substance.

OA-9. Beginning in or about August of 2015 and continuing until in or about November of 2016, an AC member known to the grand jury transported distribution amounts of methamphetamine – from two to twenty ounces – from the Houston, Texas area to another AC member in Louisiana on a weekly basis, and used the proceeds of the drug sales to finance AC activity.

OA-10. In or about March of 2016, in or near St. Louis, Missouri, KEVIN SCOTT KENT, a/k/a "BIG KEV," JESSE PAUL BLANKENSHIP, a/k/a "JP," and others known and unknown to the grand jury, forced an AC member from his home at gunpoint and drove the victim to the house of an AC leader known to the grand jury, where they burned the AC member's gang patch with a heated metal pipe and tattooed over parts of the patch.

OA-11. In or about May of 2016, JESSE PAUL BLANKENSHIP, a/k/a "JP," and another AC member known to the grand jury broke into a house in or near St. Louis, Missouri, and fired a gun at two victims.

OA-12. In or about June of 2016, in Texas, Michael Martin, a/k/a "Aryan Prodigy," a/k/a "AP," and other AC leaders known and unknown to the grand jury sanctioned a green

light on another AC member, and instructed a third AC member to provide a gun to a fourth AC member known to the grand jury to carry out the hit.

OA-13. On or about July 1, 2016, while attending a "church," or a gang meeting, in Turkey Creek, Louisiana, an AC member known to the grand jury shot another member, Clifton Hallmark, at point blank range, which ultimately killed him, during a dispute over whether members were permitted to contact a former AC member who had been removed from the gang. Several AC members known to the grand jury moved Clifton Hallmark and called local authorities in an attempt to make the shooting look like a botched robbery. KEVIN SCOTT KENT, a/k/a "BIG KEV," traveled to Louisiana from Indiana to help "clean up" after the murder. While there, he taunted investigators who were gathering evidence.

OA-14. In or about early July of 2016, after an AC member known to the grand jury murdered Clifton Hallmark, Michael Martin, a/k/a "Aryan Prodigy," a/k/a "AP," sanctioned the murder and instructed another AC member to provide AC Treasury funds and methamphetamine to the shooter for him to sell while evading law enforcement.

OA-15. On or about August 11, 2016, Michael Martin, a/k/a "Aryan Prodigy," a/k/a "AP" discussed a plan for organizing the distribution of methamphetamine with another AC member known to the grand jury.

OA-16. On or about October 2, 2016, in Tyler, Texas, Michael Martin, a/k/a "Aryan Prodigy," a/k/a "AP," Rodney Shane Holt, a/k/a "Turbo," Bobby Dayle Boney, a/k/a "Bear," Anthony Levi Cochran, Glynnwood Derrick, and others known and unknown to

the grand jury, conspired and violently attacked another AC member who wanted to leave the gang to join another gang.

OA-17. From on or about August 3, 2017, through in or about January of 2018, Malachi David Wren and Becky Westbrook conspired to smuggle the drug suboxone into a federal prison in Yazoo City, Mississippi.

OA-18. On or about August 17, 2017, at a federal prison in Yazoo City, Mississippi, WILLIAM GLENN CHUNN, a/k/a "BIG HEAD," Malachi David Wren, Jeremy Chad Dennis, a/k/a "JD", and others known and unknown to the grand jury, agreed to violently attack a victim by stabbing and beating him.

OA-19. On or about December 30, 2017, at a state prison in Trenton, New Jersey, an AC leader known to the grand jury stabbed a member of a rival gang in the throat and face with a 5-inch piece of sharpened metal in retaliation for the rival gang's disrespect of the AC.  KEVIN SCOTT KENT, a/k/a "BIG KEV," knew that the stabbing would take place before it occurred.

OA-20. On or about May 23, 2018, an AC leader known to the grand jury sent Becky Westbrook letters that she passed along to other AC leaders known and unknown to the grand jury directing a green light on rival gang members.

OA-21. On or about July 16, 2018, Becky Westbrook passed along an order to TIMOTHY LONG a/k/a "TIMMY" to attack members of a rival gang in retaliation for a prior attack on an AC member known to the grand jury.

OA-22. On or about July 17, 2018, at a federal prison in Pennington Gap, Virginia, TIMOTHY LONG a/k/a "TIMMY" attacked and stabbed a member of a rival gang.

OA-23. On or about July 23, 2018, an AC member known to the grand jury passed along "green light" orders to other AC members known and unknown to the grand jury through Becky Westbrook, instructing them to attack members of a rival gang.

OA-24. On or about August 7, 2018, Becky Westbrook passed along "green light" orders to AC members known and unknown to the grand jury, instructing them to attack members of a rival gang.

OA-25. On or about September 11, 2018, at a federal prison in Pennington Gap, Virginia, TIMOTHY LONG a/k/a "TIMMY" attacked and stabbed a rival gang member in retaliation for a prior attack on an AC member known to the grand jury.

OA-26. On or about November 14, 2018, at a federal prison in Inez, Kentucky, AC members known to the grand jury restrained, stabbed, and beat another AC member with the approval of AC leaders known and unknown to the grand jury.

OA-27. On or about February 9, 2019, an AC member known to the grand jury passed along "green light" orders to other AC members known and unknown to the grand jury instructing them to attack members of a rival gang.

## NOTICE OF SPECIAL SENTENCING FACTORS

8.    On or about August 17, 2017, in the Southern District of Mississippi, WILLIAM GLENN CHUNN, a/k/a "BIG HEAD," Malachi David Wren, Jeremy Chad Dennis, a/k/a "JD," and others known and unknown to the grand jury, while aiding and abetting each other, designed and endeavored to kill M.M., with deliberate design to effect the death of M.M.; designed and endeavored to commit an act eminently dangerous to M.M. and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of M.M.; either of the foregoing acts which, if accomplished, would constitute an offense of murder as defined in Mississippi Code Section 97-3-19, but failed and were prevented from committing the same, in violation of Mississippi Code, Section 97-1-7.

9.    On or about January 3, 2012, in the Western District of Arkansas, KEVIN SCOTT KENT, a/k/a "BIG KEV," and others known and unknown, while aiding and abetting each other, with the premeditated and deliberated purpose of causing the death of another person, did cause the death of another person; and with the purpose of causing the death of another person, did cause the death of another person, in violation of Arkansas Code, Sections 5-10-101, 5-10-102, 5-2-402, and 5-2-403.

All in violation of 18 U.S.C. § 1962(d).

THE UNITED STATES GRAND JURY FURTHER CHARGES

## COUNT TWO
*Violent Crimes in Aid of Racketeering, Kidnapping*

10. Paragraphs ONE through FIVE of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

11. At all times relevant to this indictment, the Aryan Circle, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely, acts involving murder in violation of the laws of Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, and Virginia, and kidnapping in violation of the laws of the state of Missouri; and offenses involving narcotics trafficking, in violation of Title 21, United States Code, Sections 841, 843, and 846.

12. In or about March of 2016, in the Eastern District of Texas, the Eastern District of Missouri, and elsewhere, for the purpose of gaining entrance to and maintaining and increasing position in the Aryan Circle, an enterprise engaged in racketeering activity, the defendants,

KEVIN SCOTT KENT, a/k/a "BIG KEV"; and
JESSE PAUL BLANKENSHIP, a/k/a "JP,"

and others known and unknown to the grand jury, while aiding and abetting each other, did kidnap J.J., in violation of Missouri Revised Statutes, Sections 565.110 and 562.041.

All in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

THE UNITED STATES GRAND JURY FURTHER CHARGES

## **COUNT THREE**

*Violent Crimes in Aid of Racketeering, Kidnapping Conspiracy*

13.    Paragraphs ONE through FIVE and Paragraph ELEVEN of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

14.    In or about March of 2016, in the Eastern District of Texas, the Eastern District of Missouri, and elsewhere, for the purpose of gaining entrance to and maintaining and increasing position in the Aryan Circle, an enterprise engaged in racketeering activity, the defendants,

KEVIN SCOTT KENT, a/k/a "BIG KEV"; and
JESSE PAUL BLANKENSHIP, a/k/a "JP,"

and others known and unknown to the grand jury, did conspire to kidnap J.J., in violation of Missouri Revised Statutes, Sections 565.110 and 562.014.

All in violation of 18 U.S.C. § 1959(a)(5).

THE UNITED STATES GRAND JURY FURTHER CHARGES

## **COUNT FOUR**

*Violent Crimes in Aid of Racketeering, Attempted Murder and Assault with a Dangerous Weapon*

15.     Paragraphs ONE through FIVE and Paragraph ELEVEN of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

16.     On or about July 17, 2018, in the Eastern District of Texas, the Western District of Virginia, and elsewhere, for the purpose of gaining entrance to and maintaining and increasing position in the Aryan Circle, an enterprise engaged in racketeering activity, the defendant,

TIMOTHY LONG, a/k/a "TIMMY,"

intentionally and knowingly attempted to murder B.L., and did assault B.L. with a dangerous weapon, in violation of Title 18, United States Code, Sections 1113 and 113(a).

All in violation of 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5).

THE UNITED STATES GRAND JURY FURTHER CHARGES

## COUNT FIVE

*Violent Crimes in Aid of Racketeering, Attempted Murder and Assault with a Dangerous Weapon*

17.     Paragraphs ONE through FIVE and Paragraph ELEVEN of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

18.     On or about September 11, 2018, in the Eastern District of Texas, the Western District of Virginia, and elsewhere, for the purpose of gaining entrance to and maintaining and increasing position in the Aryan Circle, an enterprise engaged in racketeering activity, the defendant,

TIMOTHY LONG, a/k/a "TIMMY,"

intentionally and knowingly attempted to murder M.Q., and did assault M.Q. with a dangerous weapon, in violation of Title 18, United States Code, Sections 1113 and 113(a).

All in violation of 18 U.S.C. §§ 1959(a)(3) and 1959(a)(5).

A TRUE BILL

_____

GRAND JURY FOREPERSON

NICHOLAS J. GANJEI
ACTING UNITED STATES ATTORNEY

_____          _____
CHRISTOPHER RAPP                          Date    7/7/2021
Assistant United States Attorney


DAVID L. JAFFE
CHIEF
ORGANIZED CRIME AND GANG SECTION
U.S. DEPARTMENT OF JUSTICE


_____          _____
BETHANY LIPMAN                            Date    7/7/21
Trial Attorney

_____          _____
REBECCA DUNNAN                            Date    7/7/21
Trial Attorney

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

JUL 08 2021

BY
DEPUTY —————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 1:18CR83 |
| v. | § | |
| | § | Judge Heartfield |
| | § | |
| WILLIAM GLENN CHUNN, | § | |
|     a/k/a "BIG HEAD"; (1) | § | |
| KEVIN SCOTT KENT, | § | |
|     a/k/a "BIG KEV"; (3) | § | |
| JESSE PAUL BLANKENSHIP; | § | |
|     a/k/a "JP"; (5) | § | |
| TIMOTHY LONG, | § | |
|     a/k/a "TIMMY" (6) | § | |

## NOTICE OF PENALTY

### Count One as to Defendants CHUNN, KENT

Violation:    18 U.S.C. §§ 1962(d)

Penalty:    Imprisonment of up to life, a fine not to exceed $250,000, or both, and supervised release of not more than five years

Special Assessment: $100.00

### Count One as to Defendants BLANKENSHIP, LONG

Violation:    18 U.S.C. §§ 1962(d)

Penalty:    Imprisonment of not more than twenty years, a fine not to exceed $250,000, or both, and supervised release of not more than three years

Special Assessment: $100.00

## Count Two

Violation:          18 U.S.C. §§ 1959(a)(1) and 2

Penalty:            Imprisonment of up to life, a fine not to exceed $250,000, or both, and supervised release of not more than five years

Special Assessment: $100.00

## Count Three

Violation:          18 U.S.C. § 1959(a)(5)

Penalty:            Imprisonment of not more than ten years, a fine not to exceed $250,000, or both, and supervised release of not more than three years

Special Assessment: $100.00

## Count Four

Violation:          18 U.S.C. §§ 1959(a)(3) and 1959(a)(5)

Penalty:            Imprisonment of not more than twenty years, a fine not to exceed $250,000, or both, and supervised release of not more than three years

Special Assessment: $100.00

## Count Five

Violation:          18 U.S.C. §§ 1959(a)(3) and 1959(a)(5)

Penalty:            Imprisonment of not more than twenty years, a fine not to exceed $250,000, or both, and supervised release of not more than three years

Special Assessment: $100.00